IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DEBORAH DAVIS, | ) | 4:06CV3012 |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM** |
| vs. | ) | **AND ORDER** |
| | ) | |
| HARTLAND HOMES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

The plaintiff, Deborah Davis, worked as a sales agent for the defendant, Hartland Homes, Inc., from November 1996 until January 2005, when she was terminated. Hartland says that it terminated Davis because she failed to meet her sales quotas for the last three quarters of 2004, but Davis claims that the real reason for her termination is that she was a 52-year-old female. Davis also alleges that Hartland's owner had created a gender-based hostile work environment prior to her termination. In addition to these Title VII[1] and ADEA[2] discrimination claims, Davis asserts that she is entitled to recover statutory penalties because Hartland failed to give required notices under COBRA[3] regarding health insurance coverage.

Hartland has moved for summary judgment on all claims. Hartland's primary argument is that Title VII does not apply because Davis worked as an independent contractor.[4] Second, it argues that Davis cannot establish a prima facie case of sex or

---

[1] Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17.

[2] Age Discrimination in Employment Act, 29 U.S.C. §§ 621 to 634.

[3] Consolidated Omnibus Budget Reconciliation Act of 1986 amendments to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1161 to 1169.

[4] Curiously, Hartland does not make this independent contractor argument with reference to the ADEA and COBRA claims, even though Hartland affirmative alleges

age discrimination, or prove that the stated reason for her termination was pretextual.[5] Finally, it argues that Davis cannot prevail on the COBRA claim because there is no evidence that she was injured or that Hartland acted in bad faith.

## *I. DISCUSSION*

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). See also Egan v. Wells Fargo Alarm Servs., 23 F.3d 1444, 1446 (8th Cir.1994). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. Bell v. Conopco, Inc., 186 F.3d 1099, 1101 (8th Cir. 1999). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with "'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'" Moody v. St. Charles County, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." Id. Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

---

in its answer that Davis "was not an employee as defined under Title VII of the Civil Rights Act of 1964, the Age Discrimination In Employment Act, or the Consolidated Omnibus Budget Reconciliation Act." (Filing 22, ¶ 30.)

[5] Hartland also argues that Davis is not entitled to recover punitive damages on her Title VII claim.

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

Rule 56(e) provides that, when a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." [6] Celotex, 477 U.S. at 324.

## A. Plaintiff's Employment Status

Title VII protects employees, not independent contractors. See Wortham v. American Family Ins. Group, 385 F.3d 1139, 1141 (8th Cir. 2004); Lerohl v. Friends of Minnesota Sinfonia, 322 F.3d 486, 488 (8th Cir. 2003). In this context, "the Supreme Court applies the general common law of agency to determine whether a

---

[6] Hartland argues that the court should refuse to consider Davis's evidence or opposing brief because they were filed one day late. While Hartland correctly notes that Davis failed to comply with NECivR 56.1(b)(2), I will exercise my discretionary authority and consider the late filings. See African American Voting Rights Legal Defense Fund, Inc. v. Villa, 54 F.3d 1345, 1350 (8th Cir. 1995) ("The district court has discretion whether to accept or reject such untimely filed materials [opposing a motion for summary judgment].")

3

hired party is an employee or an independent contractor . . . [and it] consider[s] a nonexhaustive list of factors derived primarily from the Restatement (Second) of Agency § 220(2) (1958)[.]"  Lerohl, 322 F.3d at 489 (statutory definition—i.e., an "employee" is an "individual employed by an employer"—is circular).[7]  As stated in Creative Non-Violence v. Reid, 490 U.S. 730, 751-752 (1989):

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished.  Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. . . . No one of these factors is determinative.

"In weighing these factors, 'all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'"  Lerohl, 322 F.3d at 489 (quoting Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 324 (1992)).  "The district court may properly consider economic aspects of the parties' relationship." Id. (citing Wilde v. County of Kandiyohi, 15 F.3d 103, 106 (8th Cir. 1994)).

The issue of whether a worker is an employee or an independent contractor is a question of law that may be resolved by summary judgment, provided there is no genuine issue of material fact.  Id. at 488; Wortham, 385 F.3d at 1141; Jenkins v. Southern Farm Bureau Casualty, 307 F.3d 741, 743 (8th Cir. 2002) ("Normally, a

---

[7] See 42 U.S.C. § 2000e(f).  Identical language is used to define the term "employee" in the ADEA and ERISA (including COBRA).  See 29 U.S.C. §§ 630(f) & 1002(6).  This is also how the Americans with Disabilities Act (ADA) defines an "employee."  See 42 U.S.C. § 12111(4).

judge will be able to make this determination [of employment status] as a matter of law.  However, where there is a genuine issue of fact or conflicting inferences can be drawn from the undisputed facts, the question is to be resolved by the finder of fact in accordance with the appropriate rules of law.") (quoting Lilley v. BTM Corp., 958 F.2d 746, 750 n. 1 (6th Cir.1992)).  A fact is material if its determination in favor of the non-moving party could affect the result in the case.  Jenkins, 307 F.3d at 744.

In the present case, the parties had a written contract which contained the following provision:

> 9.    INDEPENDENT CONTRACTOR.  This agreement does not constitute a hiring by either party.  The parties hereto are and shall remain independent contractors bound by the provisions hereof. Salesperson [i.e., Davis] is under the control of Company [i.e., Hartland] as to the results of Salesperson's work only and not as to the means by which such result is accomplished.  This agreement shall not be construed as a partnership, and neither party hereto shall be liable for any obligation incurred by the other except as provided elsewhere herein. Company shall not withhold from Salesperson's commission any amounts for taxes or other terms.  Company shall not make any premium payments or contributions for any workmen's compensation or unemployment compensation for Salesperson unless required by State law.  Salesperson shall not be treated as an employee with respect to the services performed hereunder for federal income purpose.

(Exhibit A to affidavit of Duane L. Hartman (filing 26-2 at 8).)  While this is strong evidence that Davis worked as an independent contractor, it is not controlling.  "The existence of a contract referring to a party as an independent contractor does not end the inquiry, because an employer 'may not avoid Title VII by affixing a label to a person that does not capture the substance of the employment relationship.'" Schwieger v. Farm Bureau Ins. Co., 207 F.3d 480, 483 (8th Cir. 2000) (quoting Devine v. Stone, Leyton & Gershman, P.C., 100 F.3d 78, 81 (8th Cir.1996).  Other pertinent provisions of the parties' contract include the following:

5

1.     APPOINTMENT OF SALESPERSON.  Company hereby appoints Salesperson as Company's agent for the solicitation of the sale of new homes to be constructed by Company.

2.     FACILITIES AND SALES EFFORT.  Salesperson agrees to proceed diligently, faithfully, loyally, legally and with their best efforts to sell any and all new homes constructed and/or to be offered by Company, and otherwise to promote the business of serving the public in real estate transactions to the end that each of the parties hereto may derive the greatest profit possible.

Company agrees for the convenience of Salesperson to provide desk space, clerical service, and office facilities at its office and/or model homes or such other places as the Company may from time to time utilize.

Company warrants that it, and/or someone of its officers, is a licensed real estate broker and that neither this agreement, nor Salesperson's agency by reason hereof shall constitute a violation of the real estate laws of the State of Nebraska.

* * *

4.     COMMISSIONS.   Salesperson shall be entitled, upon closing, to a sales commission of 2%, 2.5%, or 3% of the contract price of each home sold.   Actual percentage of commission due upon closing shall be determined by the number of "net" sales from the previous quarter at the time of closing.  At the beginning of each quarter, based on the calendar year (January 1, April 1, July 1, and October 1) the commission percentage for each sale made during the current quarter will be based on "net sales of the previous quarter.   Commission percentages will be based as follows:

a.     9 (NINE) or more sales the previous quarter: all sales will be computed at 3% of contract price of each home sold.

b.     6 (SIX) or more net sales, but less than 9(NINE) net sales the previous quarter: 2.5% of of [sic] the first 6 (SIX) sales, 3% of all sales after the 6th sale.

c.     5 (FIVE) or less net sales the previous quarter: 2% for the first 3 (THREE) sales, 2.5% for sales 4 thru 6, and 3% for all sales after the 6th sale.

d. "Net" sales for the previous quarter shall be determined at the time a home closes, and the commission due for that closing shall be determined at the time of closing.

e. "Net" sales for the quarter is determined by the total number of contracts written for that quarter, minus the number of "terminated prior to closing" contracts during that quarter.

. . .

Company agrees to provide Salesperson with standard Company group medical coverage. Salesperson understands that such compensation may constitute income for tax purposes.

5. EXPENSES. Except as specifically provided below, Company shall not be liable to Salesperson for any expense incurred by Salesperson for any of his/her acts, nor shall Salesperson be liable to Company for Company's office help or expenses, or for any of Company's acts, other than as specifically provided herein.

It is agreed by the parties hereto that certain "special expenses" directly attributable to [a] specific transaction shall be paid by Company. Such expenses shall include travel expenses, legal fees, accounting fees, renderings and items of a similar nature directly related to a specific transaction. Such "special expenses" shall not be allowable unless agreed upon in writing by the parties hereto prior to expenditure.

6. REAL ESTATE LICENSES, BOND AND DUES. Except as herein before stated, Salesperson shall pay all of the cost of his/her own real estate license and bond, and of his/her dues for membership in the National Association of Realtors, the State Real Estate Association, and in the local Board of Realtors or other dues, occupation tax and notary bond.

7. AUTHORITY TO CONTRACT. Salesperson shall have no authority to bind, obligate or commit Company by any promise or representation, unless specifically authorized by Company in writing in a particular transaction.

8. LITIGATION AND CONTROVERSIES. In the event any transaction in which Salesperson is involved results in a dispute, litigation or legal expense, Salesperson shall cooperate fully with Company. Company shall bear all expenses of litigation related to

7

construction defects, deadlines or other areas beyond the control of Salesperson.  Company and Salesperson shall share all expenses of litigation which directly involves actions of the Salesperson. . . .

* * *

10.   INSURANCE.  Upon completion of a 90 day probationary period, from the date of employment, all sales persons will be eligible for the company provided health insurance program.

11.   TERMINATION.   This agreement and the relationship created hereby may be terminated by either party hereto, with or without cause, at anytime upon three (3) days written notice give to the other.
Upon termination, Salesperson shall furnish Company with a bonafide list of all prospects, leads and probable transactions developed by Salesperson, . . ..  Salesperson shall not be compensated in respect to any transaction completed subsequent to termination of this agreement unless agreed to in writing by Company.

Salesperson further agrees not to furnish to any person, firm, company or corporation engaged in the real estate business any information as to Company's clients, customers, properties, prices, terms of negotiations, nor Company's policies or relationships with clients and customers nor any other information concerning Company and/or its business.  Salesperson shall not, after termination of this agreement, remove from the files or from the office of the Company any maps, books and publications, card records, investor or prospect lists, or any other material, files or data and it is expressly agreed that the aforementioned records and information are the property of Company. Salesperson shall be entitled to photostats of certain instruments pertaining to transactions in which Salesperson has a bonafide interest and Company shall not unreasonably withhold the same from Salesperson.

12.   AUTOMOBILE.  It is agreed that Salesperson shall furnish his/her own automobile and pay all expenses thereof and that Company shall have no responsibilities therefore.  Salesperson agrees to carry public liability insurance upon his/her automobile . . ..

(Filing 26-2 at 6-8.)

Hartland has filed affidavits from its owner and president, Daune L Hartman, his daughter and the company sales manager, Lea R. Barker, and two salespersons, Colin Keefe and Theresa Scherer.  Each of these affidavits states that:

- Salespersons working with Hartland Homes are responsible to meet individually with prospective home buyers and work with them to determine the style and size of home that matches their needs, as well as their financial situation.  After an initial determination is made, salespersons continue meeting with prospective home buyers until they have developed a final blueprint or drawing of the home and the home buyer has signed a contract to purchase the home.  Once a contract is signed, the salespersons continue working with the client to assist them with obtaining proper financing, address issues that arise during the construction of the home, including change orders, and schedule additional appointments with the home buyer including final closing. All of the above duties are performed by the salespersons without supervision and are based upon the salespersons' independent judgment and skill as licensed professionals. Additionally, the above duties are performed at whatever time and/or place the salesperson and home buyer determine. While some of the initial meetings may occur in model homes, there is no requirement that any of the meetings be held in any particular place or at any particular time.

- Additionally, salespersons are required to attend weekly sales meetings and spend time in model homes located within the City of Lincoln.

- Salespersons are responsible for their own car to travel between appointments with prospective home buyers and appointments with lending officers.  Salespersons are also responsible for their own cell phones which are primarily used to contact home buyers, provide information, and arrange meetings. Salespersons are also responsible for paying for their own marketing expenses.

- Salespersons are paid strictly on a commission basis. . . .

9

- All persons at Hartland Homes are required to sell and close at least two homes per month or six homes within a quarter, based upon a calendar year.

(Filing 26-2, ¶¶ 16-20; filing 26-3, ¶¶ 4-8; filing 26-4, ¶¶ 3-7; filing 26-5, ¶¶ 3-7.)

In response to these affidavits, Davis has submitted her own declaration which establishes that:

- Throughout [Davis's] employment, [salespersons] were required to physically be at the model homes pursuant to schedules that were made out by Hartland Homes. . . .  As shown [by an attached memo and by attached copies of schedules for November 2004, December 2004, and January 2005], the schedules averaged 5 days a week at one of the model homes.  The hours were 1:00 pm to 8:00 p.m. Monday-Thursday and 1:00 pm - 5:00 pm Friday-Sunday.  In addition, [salespersons] had phone duty once per week from 8:00 am -12:00 a.m.

- In addition to model duty and phone duty [salespersons] also had mandatory Tuesday morning sales meetings and other mandatory meetings. . . .

- From time to time assistants were hired by Hartland Homes. [Davis] had no role in the hiring of assistants.  For a short time Hartland required [salespersons] to pay $50 toward the assistants['] pay until [they] explained it was against the Real Estate Commission rules to compensate a person who is not a realtor in this fashion.  Thereafter [Davis] did not pay any amount toward the assistant salary.

(Filing 30-2, ¶¶ 4-6.)  Davis has also produced a document entitled "Standards of Procedure, Manual for Sales" that Hartland distributed to salespersons in 2003.  The document includes the following "ethics" and "professionalism" standards:

10

## A. Ethics
### a. Fiduciary Duty to the Seller

Each agent[']s fiduciary duty is to Hartland Homes, the seller.  The agents need to keep this in mind at all times.  Ask yourself, what is in the best interest of the seller?  What does he need to know to make an informed decision? Your buyers are your CUSTOMERS only.  The seller is you CLIENT.  While you should take care to advise and guide your customers, it is the seller that you own your loyalty to.
. . .

## B. Professionalism
### a. Goals

Each agent should set monthly, quarterly and yearly goals at the beginning of each calendar year.  The agent should create a plan to achieve these goals.  Agents should strive to continuously increase their production.  Agents at Hartland Homes must produce a minimum of 24 sales a year or they will be subject to dismissal.  However, this is just a minimum.  An increase in volume each year should be strived for.

### b. Dress code

Agents should wear professional attire when conducting any business for Hartland Homes.  Jeans, sweatshirts and other very casual wear is strongly discouraged.

### c. Models

**KEEPING OUR MODELS PRESENTABLE:**  Our customers' first impression of Hartland Homes is our models.  Therefore it is very important to keep them clean, neat and in good condition.  It is the sales people's responsibility to keep the Model Homes clean.  Here are a few guidelines of what you need to be doing.  Although, I'm sure there are many other items we could add to this list.  When coffee is made, please make sure counter tops and sink are wiped off to prevent stains on the counter tops.  Also make sure the coffee pot is washed out and turned off after use.  Any light bulbs that are burned out please make sure they are replaced.  If you can not reach them, ask the site superintendent to assist you.  When garbage is full please bag it up and throw it in the dumpster, if there is not a dumpster at the Model Home put waste in your trunk and throw away at the office or at the dumpster.  Do not leave garbage outside the model home.  After you use the restrooms please make sure the toilet lid is left down and sinks are wiped clean.

11

**KEEPING OUR MODELS OPEN DURING ADVERTISED TIMES:** It is imperative that when you are scheduled to be at a model that you be there during the advertised times. You may arrive early or stay late, but do not leave early because you arrived early. If you have loan applications or closings please try to schedule them before or after model duty. If this can not be done, try to have another agent cover the model for you. At the very least, always leave a note on the door as to when you will return. If you need to leave to show a house, do the same. Always, if possible, try to schedule your appointments for the model you are scheduled at. If you are ill or have a family emergency, please let Lea know as soon as possible so she can make the necessary arrangements.

**d. Taking time off**

We all need time off. When you can not cover model duty, for whatever reason, it is your responsibility to make sure another agent covers it for you. Once you have found a replacement, please let Lea know the details.

(Exhibit A to Davis declaration (filing 30-3 at 4-5).) This section of the manual also contains a disciplinary procedure:

**C. Procedure for Dealing with recurring problems with Sales People**

1st warning: Discussion in office about problem behaviors and what needs to change.

2nd warning: Write up of problem behavior(s), have signed by sales person and sales manager.

3rd time: Dismissal from company

(Id. at 5.) Other provisions of interest in the manual include the following:

**2. Commissions**

**A. General**

. . .

f.       If agent is no longer employed with Hartland Homes at the time of closing, (s)he will not be entitled to entire commission. The percentage of commission the agent will receive will be determined when agent's contract is terminated.

. . .

12

**8. Client Information Sheets-** The purpose of client information sheets is three-fold.  1) To help the agent get the necessary information from the client and provide a client with a copy.  2) To aid in disputes between agents when there is a cross-sale or potential cross-sale.  3) To aid management in tracking the effectiveness of advertising.  Agents should turn in all client information sheets on a weekly basis.  Please make sure you have filled out the top portion completely, including the advertising portion.  If it was self-promotion, such as home mart or personal mailing, just write ME or other.

**9. Advertising and Self Promotion**
The company has a large advertising budget which is done for everyone.  However, self-promotion is encouraged.   Any agent may promote themselves at their own expense.  All advertising and promotion must be cleared through LEA first to assure all real estate guidelines are met.

. . .

**11.  Lending Institutions**
**A.  Where to go-** First Mortgage Company is the preferred institution.

(Id. at 6; filing 30-4 at 4.)

I will not consider three other documents that are attached to Davis's declaration because they would not be admissible in evidence.  See Fed. R. Civ. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.  Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.").

Two of the documents (Exhibit E) are determination letters issued by the Internal Revenue Service on May 17, 2006, in response to a request from Davis, finding that she was an employee of Hartland from 1996 through 2004, and not an independent contractor.  The statements contained in these letters are hearsay, but "factual findings resulting from an investigation made pursuant to authority granted

13

by law" are admissible under the "public records" hearsay exception "unless the source of information or other circumstances indicate lack of trustworthiness."  See Fed. R. Evid. 803(8)(C).  A lack of trustworthiness is plainly evident here, as one of the letters specifically states: "This determination is based on the application of law to the information presented to us and/or discovered by us during the course of our investigation; however, we are not in a position to personally judge the validity of the information submitted."  (Filing 30-8 at 7.)  Because the IRS did not act in a judicial capacity in responding to Davis's request for a determination, its legal conclusion that she worked as an employee also can have no preclusive effect in this litigation.  See Morrison v. International Programs Consortium, Inc., 253 F.3d 5, 9-10 (D.C. Cir. 2001) (IRS determination regarding employment status not entitled to preclusive effect in FLSA action where IRS's letter stated that "[a]s we are not in a position to personally judge the validity of the facts provided, our determination is based on the information presented.").

The third document (Exhibit F) is not properly authenticated.  Davis merely states:  "I also have been provided a memo, a true and correct copy of which is attached hereto and marked "exhibit F" which shows that Hartland previously had been made aware of the Independent Contractor vs. employee issues as early as 1994." (Filing 30-2, ¶ 8.)   Authentication means more than "my opponent gave me a document."  Cordray v. 135-80 Travel Plaza, Inc., 356 F. Supp. 2d 1011, 1016 n. 5 (D.Neb. 2005).   Hartland has denied through supplemental affidavits (filing 32-2, and 32-3, ¶¶ 3-4) that the memo was ever distributed to salespersons or implemented as company policy, but has not directly authenticated the document.

I also find that certain statements of material fact set forth in Davis's brief are not supported by the record, or at least not by the cited portion of the record.  Thus, disregarding wholly conclusory statements, I do not find evidence to support Davis's statements that her work "was performed primarily at the model homes of Hartland Homes and the home office" (filing 27 at 2, ¶ 2d (emphasis supplied)), that she "worked exclusively for Hartland Homes from November 1996, to January 10, 2005"

14

(id., ¶ 2*e* (emphasis supplied)), or that Hartland "reserved the right to assign additional projects to [her]" (id., ¶ 2*f*).  Davis's declaration also fails to establish that she "was provided with group health insurance benefits" (id. at 3, ¶ 2*l*).[8]  Davis has alleged in her amended complaint that she "was on employee health insurance" (filing 21, ¶ 8*a*) and "was covered under a Group health employment plan of the Defendants" (id, ¶ 31), but Hartland has denied these allegations.  (Answer to amended complaint (filing 22), ¶¶ 5, 25.)  As previously noted, however, the parties' contract states that "all sales persons will be eligible for the company provided health insurance program" after a 90-day probationary period.

In accordance with the procedure that was outlined by the Court of Appeals in Schwieger, my analysis of Davis's employment status will start with the question of control and then proceed to consider the 12 additional factors listed in Darden and the "economic realities" of the work relationship.  Hartland "submits that it had little, if any, control over the day-to-day operations by the Plaintiff in meeting with customers and selling homes" (filing 25 at 8), whereas Davis claims that she "was under the complete control of Hartland."  (Filing 27 at 11.)

While Davis overstates her case, it is obvious that Hartland did exercise considerable control over her sales activities by demanding that she meet quotas, that she attend weekly sales meetings, and that she staff the model homes and the office phone at scheduled times.  The procedure of giving two warnings before a discharge is also indicative of an employee-employer relationship.

Additionally, Davis claims that she worked exclusively for Hartland in her capacity as a real estate agent; although this fact has not been established, it could be determinative of the control issue if exclusivity was a requirement of working as an agent for Hartland.  See Lerohl, 322 F.3d at 491 (relevant control issue regarding

---

[8] Davis's brief references a copy of an insurance card that is attached to her declaration (Exhibit D), but this document is unauthenticated and not entirely legible.

15

professional musicians was not whether they could be told where to sit and when to play when performing, but whether they were "free-lance" or "in-house" performers).

On the other hand, the fact that Davis acted as a licensed real estate agent while working for Hartland [9] "weighs heavily in favor of independent contractor status." Schwieger, 207 F.3d at 485 (insurance agent was a licensed professional). That is, the "skill required" to perform the job of selling homes, excluding janitorial duties at model homes, is something more than that required for an ordinary sales position, and Davis owed certain ethical duties to her customers.

According to Hartland, the only "instrumentalities and tools" required for the job were an automobile and cell phone, which Davis supplied, but it has not shown how much either of these was actually used on the job. After all, most employees provide their own cars to get to work, and many also carry their own cell phones. Davis also points out that the parties' contract required Hartland to provide desk space, clerical service, and office facilities. Davis was responsible for her own marketing expenses, if any, but Hartland had a "large advertising budget" that benefitted all salespersons. On the evidence presented, and not counting the model homes as a sales tool, this factor does not clearly favor either party.

Davis's evidence suggests that the primary "location of the work" was the model home sites. If I understand her declaration correctly, she was scheduled by Hartland to work 5 days a week at the model homes, for at least 4 hours a day, and sometimes for 7 hours. She was also required to work at the office for 4 hours one morning each week answering the phone, and to attend sales meetings at the office on Tuesday mornings. This factor points toward Davis being an employee. Hartland concedes that the 8-year "duration of the relationship between the parties" also is indicative of employee status.

───────────────

[9] Although Hartland's statement of material facts only cites Davis's testimony that she currently holds a license (filing 25 at 3, ¶ 2), Davis also testified that she held a license from April 1996 until March 2005 (filing 26 at 9:19-10:16).

It does not appear that Hartland had "the right to assign additional projects" to Davis.  In fact, just as in <u>Schwieger</u> where the plaintiff's job was to sell insurance policies by establishing her own client base, it does not appear that any projects were assigned to Davis.  This factor favors a finding of independent contractor status.

The next <u>Darden</u> factor, "the extent of the hired party's discretion over when and how long to work," has already been touched upon in discussing the question of control and the work location factor.  While a significant amount of Davis's work week was scheduled by Hartland, it did not entail a full-time work schedule.  Thus, this factor leads to another mixed result.

The commission "method of payment" weighs in favor of finding that Davis was an independent contractor.  Davis testified, however, that she was paid a salary of $2,000 per month for the first 6 months that she worked for Hartland.  (Filing 26 at 20:22-21:4.)  The fact that a salesperson who "is no longer employed with Hartland Homes at the time of closing" is not entitled to receive a full commission also argues against finding an independent contractor relationship.  Again, this factor leads to mixed results.

Hartland claims that "[s]alespersons do not have assistants" (filing 25 at 11), but Davis has presented evidence, which has not been rebutted, that assistants were hired and paid for by Hartland from time to time.  The eighth factor, "the hired party's role in hiring and paying assistants," thus indicates that Davis was an employee.

Hartland argues that the ninth factor, "whether the work is part of the regular business of the hiring party," weighs more heavily in its favor because it is in the business of constructing new homes, which was not part of Davis's sales job.  Hartland, however, is also in the business of selling new homes.  In fact, Hartland expressly warranted in the parties' contract that it or one of its officers was a licensed real estate broker.  This factor clearly favors Davis.  Hartland concedes that the tenth factor, "whether the hiring party is in business," also counts in Davis's favor.

17

The eleventh factor, "the provision of employee benefits," cuts both ways but generally favors Hartland.  The only benefit that appears to have been provided is group health insurance.

The twelfth, and final factor from the <u>Darden</u> list is "the tax treatment of the hired party."  As contracted by the parties, this factor plainly weighs in favor of independent contractor status.  In addition to the "independent contractor" provision that was previously quoted, the parties' contract contained the following, separately signed "notice to salesperson regarding federal tax obligations":

> Salesperson shall not be treated as an employee for federal tax purposes with respect to all services performed by Salesperson pursuant to the written contract between Broker and Salesperson dated November 25, 1996.  Furthermore, Salesperson shall be responsible for paying his estimated income and self-employment taxes with respect to remuneration received from Broker for such services.

(Filing 26-2 at 9.)

Finally, considering the "economic realities" of the parties' relationship, Hartland argues, in line with <u>Schwieger</u>, that it had no paid leave or vacation policy, and that the contract could be terminated at will by either party.  The first factor weighs in favor of independent contractor status, but the Eighth Circuit has more recently held that the ability of either party to terminate the relationship "is equally as consistent with employment status, given that employment contracts are generally considered to be terminable at will."  <u>Jenkins</u>, 307 F.3d at 744 n. 3.

To summarize, I find that 5 of the <u>Darden</u> factors support the conclusion that Davis was an employee, while 4 of the <u>Darden</u> factors and the "economic realities" factor support the conclusion that she was an independent contractor.  Three of the <u>Darden</u> factors are inconclusive, as is the issue of control.  While the inquiry "requires more than simply tallying factors on each side and selecting a winner on the basis of a point score," <u>Schwieger</u>, 207 F.3d at 487, my tally illustrates that the question of

18

Davis's employment status is a close one.   While the record is not as complete as it could be, there does not appear to be any genuine issue of material fact that would prevent a determination of the issue as a matter of law.   Therefore, for purposes of deciding the summary judgment motion, I find that Davis was an employee who was expected to show up for work as needed by Hartland and to meet sales quotas as prescribed by Hartland, and who was entitled to the protections afforded by Title VII.

## B.  Termination Decision

There is no direct evidence that Hartland's decision to terminate Davis was based on her sex or age.   Consequently, Davis's discrimination claims will be analyzed using the familiar three-step, burden-shifting analysis set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, (1973).  See Maxfield v. Cintras Corp. No. 2, 427 F.3d 544, 550 (8th Cir. 2005).   Under the McDonnell Douglas framework, a plaintiff first has to establish a prima facie case by showing that she: (1) is a member of a protected group; (2) was meeting the legitimate expectations of the employer; (3) suffered an adverse employment action; and (4) under circumstances permitting "an inference of discrimination."   Id. (quoting Zhuang v. Datacard Corp., 414 F.3d 849, 854 (8th Cir. 2005)).  If the plaintiff establishes a prima facie case, the defendant must articulate a legitimate, nondiscriminatory reason for the action.  Id.  If the defendant does so, the plaintiff must offer evidence showing that the defendant's legitimate reason is merely a pretext for discrimination.  Id.

It is undisputed that Davis can prove the first and third elements of a prima facie case of discrimination under Title VII and the ADEA.  Hartland argues that Davis cannot prove she was meeting its legitimate expectations, in that she failed to meet her sales quota for the last three quarters of 2004.  Davis counters that she was qualified to perform the job[10] because she was a licensed real estate agent who had

---

[10] Davis actually argues that she was "qualified to perform the essential functions of her job."  (Filing 27 at 16-17.)  This is an element of a prima facie case under the Americans with Disabilities Act (ADA) that has no direct application here.

19

sold homes for Hartland for since 1996, and in all those years she had received only one written warning, in 2002, that was unrelated to her sales performance.  She also claims that only one salesperson sold more homes or earned more commissions than her during 2004.

Recently, in Riser v. Target Corp., 458 F.3d 817, 820 (8th Cir. 2006), the Court of Appeals acknowledged that it has not consistently articulated the second element of a prima facie case under Title VII.  Compare Box v. Principi, 442 F.3d 692, 696 (8th Cir.2006) (plaintiff's burden to prove that "she was meeting the legitimate expectations of her employer"), with Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 850 (8th Cir.2005) (plaintiff's burden to prove that "she was qualified for her position").  The Court in Riser avoided having to decide whether "there is a distinction with a difference between the two articulations," 458 F.3d at 820, by assuming that the plaintiff could establish a prima facie case and then finding that he was discharged for a legitimate, nondiscriminatory reason (i.e., substandard performance).  However, circuit precedent clearly provides that in order to prove that she was qualified for her position, Davis "must demonstrate that she was actually performing her job at a level that met her employer's legitimate expectations."  Whitley v. Peer Review Systems, Inc., 221 F.3d 1053, 1055 (8th Cir. 2000).  See Miller v. Citizens Sec. Group, 116 F.3d 343, 346 (8th Cir. 1997) (correct statement of the "qualification element" in a discriminatory discharge case is that the employee "was performing his job at a level that met his employer's legitimate expectations.").[11]

---

[11] In Jordan v. BNSF Ry. Co., No. 4:05CV3104, 2006 WL 436033, *3 (D.Neb. Feb. 21, 2006), I declined to consider the employer's argument that the plaintiff could not establish a prima facie case of racial discrimination because he was discharged for immoral conduct that occurred at a company-leased motel between his work shifts. I stated that the employer's argument "improperly conflates the three steps of the McDonnell Douglas burden-shifting analysis."  Id.  Left unstated was my conclusion that even though the alleged misconduct provided a legitimate, nondiscriminatory reason for discharging the employee, it was not directly related to the employee's job performance, and thus was better analyzed under the second and third steps of the McDonnell Douglas scheme.

Hartland has presented evidence that:

- Salespersons were required to sell and close 2 homes per month, or 6 homes per quarter.

- During 2003, Davis sold the following number of homes during each quarter that later closed:  10, 7, 8, and 11.

- During 2004, Davis sold the following number of homes during each quarter that later closed: 12, 4, 5, and 2.

(See filing 25 at 4-5, ¶¶ 7, 9-10 and affidavits referenced therein.)

Davis protests that "[t]here was not a strict requirement that [she] sell six [homes] per quarter" (filing 27 at 4), and she points out, first of all, that her contract does not contain such a requirement, but instead provides for commission payments that includes sales of fewer than six homes per quarter.  Secondly, she observes that Hartland's written procedures manual does not specify a monthly or quarterly quota, but merely provides that salespersons "must produce a minimum of 24 sales a year."[12] Third, and finally, Davis argues that two male employees were retained by Hartland even though they failed to sell six homes per quarter.

There is no inconsistency between the contract's commission schedule and Hartland's evidence that an agent was expected to sell 2 homes each month.  Under the commission schedule, in fact, she would be penalized if she failed to sell at least 6 homes per quarter.  In response to questioning, Davis testified that until 2003, when the written manual was issued, there was no requirement that she "sell so many homes or close so many homes per month."  (Filing 26-6 at 21:16-22:4.)  She recalled, though, that  the manual "said that you needed to sell two per month."  (Id. at 22:1-4.) This recollection is consistent with everyone else's understanding of the sales quota. Davis's final argument, even if true, only tends to prove that she was discriminated against because she is female.

---

[12] Hartland's evidence also shows that Davis only sold 23 homes in 2004.

21

Davis claims that her sales performance in 2004 was above average, and has produced documents to support this claim. Thus, she states in her declaration:

> Attached hereto and marked "exhibit H" are copies showing production of sales people for years 1998-2005. These documents were provided to all sales people by Hartland. The first eight pages relate only to sales during the year.[13] The last page of exhibit 9 [sic] reflects my last full year worked and shows that I closed 35 homes within the last year I worked there and was the 2nd highest in sales. My year to date closed commissions were $129,630.26 because I closed $4,443,745 in home sales for Hartland Homes.

(Filing 30-2 at 2, ¶ 11.) Hartland objects to this statement on the single ground (and without any explanation) that it "lacks foundation" (filing 31 at 2) Although the statement may be objectionable on other grounds, I do not find that it is lacking in foundation. Hartland has not objected to the underlying Exhibit H.[14]

Considering Davis's statement, however, the fact that she earned commissions on 35 closings during 2004 does not controvert Hartland's evidence regarding her 2004 sales performance. That evidence shows that there were 20 closings in 2004 on sales that Davis made during that year, and 3 more closings in 2005 (after Davis's termination). The 15 additional closings that Davis had in 2004 could easily have

---

[13] Exhibit H only contains 8 pages. The first 7 pages are spreadsheets captioned "Individual and Company Sales Goals" for the years 1998, 1999, 2000, 2001, 2002, 2003, and 2005, but there is no spreadsheet like this for the year 2004. The final page of the exhibit is a completely different looking document, captioned "Monthly Sales Chart" that is dated December 31, 2004.

[14] "To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Fed. R. Civ. P. 56(e)." Stuart v. General Motors Corp., 217 F.3d 621, 636 (8th Cir. 2000). Davis's statement that "[t]hese documents were provided to all sales people by Hartland" is marginally sufficient to show that she received these documents in the regular course of her employment, but this cannot be true with respect to the 2005 spreadsheet, which is dated 11/30/2005, long after her termination.

22

come from 2003 sales, and, in fact, Hartland has presented supplemental affidavits from Hartman and Barker which establish that "[a]t the end of 2003, [Davis] had sold twenty houses that had not yet closed." (Filing 32-2 at 3, ¶ 10; filing 32-3 at 2, ¶ 9.) They also state that "at the end of 2002, [Davis] had sold fifteen houses that had not yet closed." (Id.) The fact that Davis only had 3 home sales left to close in 2005 is indicative of her substandard sales performance during the last 3 quarters of 2004.

Davis also claims that Hartland's evidence (Exhibit A to Barker affidavit) shows that "she sold 18 homes in the first quarter of 2004, 7 homes in the second quarter, 8 homes in the third quarter, and three homes in the fourth quarter of 2004," or a total of 36 homes. (Filing 27 at 4.) It is obvious, however, that these are not the number of home sales that closed. Davis does not dispute that Hartland's quotas were based on closed or "net" sales, which, in her case, totaled 23 for 2004 sales.

Even though Davis is unable to rebut Hartland's evidence that she failed to meet her sales quotas during the last 3 quarters of 2004, there is a genuine issue of material fact as to whether Hartland is being truthful in claiming that Davis was terminated for this reason. Hartland claims that its sales manager, Barker, met with Davis on July 1, 2004, and expressed concerns about the low number of sales in the second quarter; that Barker met with Davis again after the third quarter and warned that she would be terminated if her sales performance did not improve; and that Davis was terminated on January 10, 2005, because she failed to improve her performance during the fourth quarter of 2004. (See filing 25 at 5, ¶¶ 11-13.) Davis denies that she received any such warnings, and claims that the only warning she ever received was a written warning issued on December 30, 2002, for "[f]ailure to complete [her] full work day at the model, failure to be respectful to supervisor and co-workers, and failure to take responsibility for information given to customers." (Filing 30-2, ¶ 9; filing 30-10 (Exhibit G).)

The alleged lack of warnings must be considered material to the issue of whether Davis was meeting Hartland's legitimate expectations, or else an anomalous would result. That is, Davis would lose at the prima facie case stage even though

there is a genuine issue whether her dismissal for failing to meet Hartland's sales quotas was really a pretext for unlawful discrimination.  In other words, the disputed fact question of whether Hartland followed its disciplinary procedure in this case is relevant to deciding whether its quota of 6 home sales per quarter is a "legitimate" expectation for a salesperson's performance.  See Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 517 (4th Cir.) (where application of the qualification or expectation element of the prima facie case seems to preclude an otherwise meritorious claim, the plaintiff is free to demonstrate that the employer's qualifications or expectations are not, in fact, "legitimate"), petition for cert. filed, 74 U.S.L.W. (U.S. May 1, 2006) (No. 05-1387).  Thus, it may be possible for Davis to prove the second element of her prima facie case, even if she failed to meet her sales quotas during the last 3 quarters of 2004, by showing that she was not warned about these failures and that in other respects she was performing her job in a satisfactory manner.

Davis can prove the fourth element of a prima facie case by showing that she was treated differently from similarly situated males, see Tenge v. Phillips Modern Ag Co., 446 F.3d 903, 910 (8th Cir. 2006) (Title VII), or similarly situated younger employees, see Baucom v. Holiday Companies, 428 F.3d 764, 771 (8th Cir. 2005) (ADEA).[15]   Anticipating Davis's evidence, Hartland has made a showing that two male salespersons under age 40, John Graham and Rob Conway, were terminated in 2004 for failing to sell at least two houses per month.  Davis has not presented any evidence to refute this showing, but she contends that Graham and Conway were treated differently from her in other respects.  Thus, Davis states in her declaration:

> John Graham was not terminated as Hartland suggests.  He was warned that he had to produce a certain number of homes within the next specific period of time.  When he was unsuccessful, he was made a sales assistant and worked with Lea Barker and the sales people.  Rob Conway

---

[15] Davis might also show that she was replaced by a male, see Johnson v. Baptist Medical Center, 97 F.3d 1070, 1072 (8th Cir. 1996), or by a younger employee, see Schierhoff v. GlaxoSmithkline Consumer Healthcare, L.P., 444 F.3d 961, 965 (8th Cir. 2006), but there is no evidence of this happening.

was also warned he had to produce a certain number of sales within a certain period of time or he would be terminated however he was not terminated until later and was allowed to close all homes he has sold and received full commission.  Both are male and younger than I.  I never was given such a warning, probably because I was the second to highest sales producer.

(Filing 30-2, ¶ 10.)  Hartland has objected to this evidence, and I agree that Davis has not shown that she has personal knowledge regarding any warnings that may have been given to Graham or Conway, or how much time passed until the terminations occurred.  Presumably, however, Davis was in a position to know that Graham became a sales assistant after being terminated as a salesperson.  The fact that his employment continued,[16] while Davis's did not, is sufficient to create an inference of discrimination.

The second and third steps of the <u>McDonnell Douglas</u> analysis in this case require little discussion.  Hartland has articulated a legitimate, nondiscriminatory reason for deciding to terminate Davis's employment.  Hartland has also attempted to show that Davis was forewarned, but Davis claims this is a lie and evidence of pretext.  I find that a jury issue is presented.

In conclusion, Davis's discriminatory discharge claims will survive summary judgment.  There is evidence that a younger, male salesperson was allowed to remain a Hartland employee (albeit in a different position) after failing to meet sales quotas, and there is a genuine issue of material fact regarding the truthfulness of Hartland's stated reason for terminating Davis.  "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 148 (2000).

---

[16] Although Davis argues in her brief that "Conway had not sold the requisite number of homes per quarter with the exception of one quarter the entire time he worked for Hartland Homes" (filing 27 at 6), this argument relies on an incomplete exhibit (Exhibit H to Davis declaration) and is thus unsubstantiated.

## C. Hostile Work Environment

To establish a prima facie case of sex discrimination based on a hostile work environment, a plaintiff employee must establish that (1) she was a member of a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; and (4) the harassment was sufficiently severe or pervasive as to affect a term, condition, or privilege of employment.  Cottrill v. MFA, Inc., 443 F.3d 629, 636 (8th Cir. 2006).  If the harassing conduct is attributable to a co-worker, the plaintiff must also show that her employer "knew or should have known of the conduct and failed to take proper remedial action."  Cheshewalla v. Rand & Son Const. Co., 415 F.3d 847, 850 (8th Cir. 2005), cert. denied, 126 S.Ct. 1033 (2006). If, however, the plaintiff has been harassed by a supervisor,[17] then the employer "is vicariously liable for the harassment unless it can establish the affirmative defense defined in Burlington Indus., Inc. v. Ellerth[, 524 U.S. 742 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775 (1998)]."  Id.

The alleged harasser in this case is Duane Hartman, the owner and president of Hartland.  Hartman's supervisor status is not disputed by Hartland (except to the extent that Davis is alleged to have worked as an independent contractor), nor is there any assertion of the Ellerth/Faragher affirmative defense.[18]

Davis alleges that "[n]early every day of [her] employment, Hartman swore at, intimidated, and belittled female employees, including [Davis], . . . [but] did not treat

---

[17] "To be considered a supervisor, 'the alleged harasser must have had the power (not necessarily exercised) to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties.'" Cheshewalla, 415 F.3d at 850-51 (quoting Joens v. John Morrell & Co., 354 F.3d 938, 940 (8th Cir. 2004)).

[18] The Ellerth/Faragher affirmative defense protects employers in harassment cases in which an employee fails to stop the harassment by using the employer's effective anti-harassment policy.  McCurdy v. Arkansas State Police, 375 F.3d 762, 772 (8th Cir. 2004), cert. denied, 543 U.S. 1121 (2005).

male employees in the same fashion"; that "[o]n  more than one occasion, Hartman made inappropriate sexual comments, such as asking [Davis] if she was in a 'sexual crisis'"; and that "[o]n several other occasions, Hartman hit [Davis] in the buttocks with a crutch."  (Amended complaint (filing 21), ¶¶ 11-14.)

For purposes of its summary judgment motion, Hartland concedes that Davis has established through her deposition testimony that she was told by Hartman to "shut the F up"; that Hartman's tone intimidated her; that on one occasion Hartman asked Davis if she was in a "sexual crisis"; that Hartman hit Davis on her buttocks with a crutch on two occasions; that Hartman "cussed her out" over the phone and in his office; and that Hartman stared at Davis's breasts on one occasion. (Filing 25, at 16.)  Hartland also states Davis testified that she was only around Hartman during once-a-week sales meetings and that if she was in the office on other occasions she would not speak to him.  (Id., at 16-17.)

Davis complains that the foregoing summary of her deposition testimony was not included in the "statement of material facts" section of Hartland's brief, and charges that Hartland has violated our local rules requiring the moving party to "set forth in the brief in support of the motion for summary judgment a separate statement of material facts as to which the moving party contends there is no genuine issue to be tried and that entitle the moving party to judgment as a matter of law."  NECivR 56.1(a)(1).  While from the court's perspective it would have been preferable for Hartland to have included this summary in its "statement of material facts"—which then would have required Davis to controvert any disputed statements, see NECivR 56.1(b)(1)—it was not required to do so because Davis has the burden of proving a prima facie case of sexual harassment.[19]  Hartland argues that the incidents described "do not rise to the level required to establish that a condition, privilege or term of [Davis's] employment was affected[.]"  (Filing 25, at 16.)  In other words, Hartland

_____

[19] On the other hand, Hartland cannot attempt to disprove Davis's allegations by using evidence that has not been incorporated into the "statement of material facts."

argues that Davis cannot prove the fourth essential element of her prima facie case, even assuming that some unwelcome, sex-based harassment did occur.

"Harassment affects a term, condition, or privilege of employment if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Nitsche v. CEO of Osage Valley Elec. Co-op., 446 F.3d 841, 845 (8th Cir. 2006) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). "[The plaintiff] must clear a high threshold to demonstrate actionable harm, for 'complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing' obtain no remedy." Id. at 845-46 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)). "[A] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Id. at 846 (quoting Faragher, 524 U.S. at 787). "To be actionable, the conduct complained of must be extreme in nature and not merely rude or unpleasant." Id. "Allegations of a few isolated or sporadic incidents will not suffice; rather, the plaintiff must demonstrate the alleged harassment was 'so intimidating, offensive, or hostile that it poisoned the work environment.'" Id. (quoting Tuggle v. Mangan, 348 F.3d 714, 720 (8th Cir. 2003). "Such standards are demanding, for 'Title VII does not prohibit all verbal or physical harassment' and is not 'a general civility code for the American workplace.'" Id. (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998). "In determining whether a work environment was sufficiently hostile or abusive, [courts] examine the totality of the circumstances, including whether the discriminatory conduct was frequent and severe; whether it was physically threatening or humiliating, as opposed to merely an offensive utterance; and whether it unreasonably interfered with the employee's work performance." Id.

At her deposition, Davis was asked the following questions by Hartland's attorney, and she gave the following answers, regarding her allegation that Hartman regularly swore at, intimidated, and belittled female employees:

28

Q.      Now, as part of your allegations in the complaint filed in U.S. District Court, you've alleged that you were subjected to a hostile work environment because of the actions of Mr. Hartman; correct?

A.      Yes.

Q.      And you've alleged that he swore at you?

A.      Yes.

Q.      And specifically what did he say, and when did he say it?

A.      I don't think you want me to repeat some of it.

Q.      No.  I do.  I want you to repeat specifically what you recall about Mr. Hartman swearing at you.

A.      The swearing usually was in the sales meetings. Could have been in his office.

Q.      And when did this occur?  What's the timeframe?

A.      Probably -- in the very beginning when I started at Hartland Homes, I didn't see Mr. Hartman that much.  I avoided him.  I was kind of scared of him.  So I was pretty conservative, pretty quiet. Toward the last, I'd say around 2001, 2002, the cussing, belittling. I can't remember all the exact words.  I just remember how he made me feel.

Q.      And how did he make you feel?

A.      Pretty -- like a second-class citizen.

Q.      Are these remarks that are directed at you individually?

A.      Some.

Q.      And give me an example of a specific instance.

A.      Shut the F up.

Q.      And this occurred at a sales meeting?

A.      Yes.

Q.      And when did it occur?

A.      During the sales meetings every Tuesday at 9:30 to around 12 o'clock, depending on his mood.

Q.      And over what period of time?

A.      Months, years.

Q.      How many times did he say that to you over that period of time?

A.      I can't recall the amount, the number.

Q.      Once?

A.      A lot more than once.

Q.      How many times?

A.      Daily basis.

Q.      Did you have daily meetings?

29

A.     No.

Q.     You've alleged that he intimidated you.  How did he intimidate you?

A.     Just his tone.

Q.     You've alleged that he belittled female employees.  How did he belittle female employees?

A.     Talked down to them.

Q.     And to whom did he do that?

A.     I would say most everybody that works there.

Q.     Can you give me --

A.     Including his own daughter.

Q.     Can you give me some specific examples?

A.     Not off the top of my head, I can't.

* * *

Q.     Other than the things that we've just described, are there other things that you are alleging occurred that Mr. Hartman did to subject you to a hostile work environment?

A.     He's cussed me out over the phone.  He's cussed me out in his office where you could hear him all the way out to the garage, and everybody in the office has heard it.

* * *

Q.     Were there any other actions by Mr. Hartman that you recall today?

A.     You want to finish your sentence?  What do you mean other actions?  It was continuous.

Q.     Okay. Describe for me -- if -- I'm trying to have you describe for me all actions that you are alleging Mr. Hartman did, okay, during the course of your time as a sales professional at Hartland Homes that subjected you to a hostile work environment.

A.     It was every day, Mr. Nelson.  When I came into the office, you know, we'd ask -- I'd even ask the receptionist what kind of mood -- if I had to talk to him, what kind of mood is he in.  You never knew what kind of mood he was in.

Q.     Okay.

A.     If he was in a bad mood, no, I didn't try to go talk to him.

30

* * *

| | |
|---|---|
| Q. | And if Mr. Hartman -- I believe you've alleged that Mr. Hartman would have told you something to the effect of shut the fuck up or I'm running this meetings.  Would those have been occasions when you were talking to somebody else during the sales meeting? |
| A. | Not necessarily, no. |
| Q. | Tell me specifically what you recall. |
| A. | If I even asked -- whispered for someone to pass the coffee, I would get that kind of comment.  I didn't normally try to talk in those meetings. |
| Q. | Did Mr. Hartman have occasion to say something to that effect to other sales agents there? |
| A. | Yes. |
| Q. | Including male sales agents? |
| A. | I've never heard him say that directly to a male person. |

(Filing 26-6 at 34:20-37:11, 39:23-40:5, 40:23-41:16, 64:13-65:6.)

Considering this testimony in the light most favorable to Davis, together with the other portions of her testimony as summarized by Hartland, I conclude that a jury might reasonably find that there was a hostile work environment.  See, e.g., Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 574 (8th Cir. 1997) (evidence that supervisors directed harsh treatment, abusive language, and profanity at women, but not at men, was sufficient to establish hostile work environment claim); Smith v. St. Louis University, 109 F.3d 1261, 1264-65 (8th Cir. 1997) (reversing summary judgment for employer where plaintiff faced consistent ridicule and derogatory comments about women, even though they were not sexually explicit); Kopp v. Samaritan Health System, Inc., 13 F.3d 264, 269 (8th Cir. 1993) (evidence of abusive conduct, including shouting and swearing at female employees and using vulgar names, sufficient to preclude summary judgment for employer).  Cf. Schoffstall v. Henderson, 223 F.3d 818, 826-27 (8th Cir. 2000) (summary judgment for employer affirmed where no evidence showed that supervisor's physically and verbally abusive behavior directed at plaintiff was based on her sex).  "Once there is evidence of improper conduct and

subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury." Howard v. Burns Bros., Inc., 149 F.3d 835, 840 (8th Cir. 1998).

### D.  Punitive Damages

"Under the terms of [§ 1981a(b)(1) ], . . . punitive damages are available in claims under Title VII . . . [where] the employer has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" Ogden v. Wax Works, Inc., 214 F.3d 999, 1008 (8th Cir. 2000) (quoting Kolstad v. American Dental Ass'n, 527 U.S. 526, 529-30 (1999)).  "This standard does not require egregious misconduct, but there must be evidence that the employer intentionally discriminated and had 'knowledge that it may be acting in violation of federal law.'" Rowe v. Hussmann Corp., 381 F.3d 775, 783-84 (8th Cir. 2004) (quoting Kolstad, 527 U.S. at 535) (citation omitted).

Davis has not responded to Hartland's argument that there is no evidence to support her claim for punitive damages in connection with her Title VII claim, and I agree with Hartland's assessment of the record.  Accordingly, I will enter partial summary judgment on this issue.  See Pedroza v. Cintas Corp. No. 2, 397 F.3d 1063, 1071 (8th Cir. 2005) (even if Court of Appeals had found that underlying Title VII claims survived summary judgment, record would not justify submission of claim for punitive damages to the jury).

### E.  COBRA Notices

COBRA requires that a group health plan provide, "at the time of commencement of coverage under the plan, written notice to each covered employee . . . of [her COBRA] rights." 29 U.S.C. § 1166(a)(1).  Those rights include the sponsoring employer's obligation to offer continuation coverage to employees and their spouses for at least eighteen months following a "qualifying event" that results

in a loss of group health plan coverage.  See 29 U.S.C. §§ 1161(a), 1162(2), 1163.
When a "qualifying event" occurs, "the employer of an employee under a plan must
notify the plan administrator" and the plan administrator must then give additional
notice of the right to elect continuation coverage.  See 29 U.S.C. § 1166(a)(2) & (4).
A "qualifying event" includes termination of the covered employee's employment.
See 29 U.S.C. § 1163(2).  A plan administrator that fails to meet either or both of
these notice requirements "may in the court's discretion be personally liable to such
participant or beneficiary in the amount of up to $100 a day from the date of such
failure . . .  and the court may in its discretion order such other relief as it deems
proper."  29 U.S.C. § 1132(c)(1)(A).

Davis only generally alleges that "Defendants [sic] have failed to give notices
under Consolidated Omnibus Budget Reconciliation Act (COBRA) 29 U.S.C. 1166."
(filing 29 at 6, ¶ 33).  She does not allege that Hartland was the plan administrator, nor
is there any evidence to this effect,[20] but Hartland's summary judgment motion is
based on a limited argument that Davis has not alleged, and cannot prove, "that she
suffered any damages, or that Defendant acted in bad faith."  (Filing 25 at 21.)

As a matter of law, Hartland's argument does not permit the entry of summary
judgment.  The Eighth Circuit has held that "[a]lthough relevant, a defendant's good
faith and the absence of harm do not preclude the imposition of the § 1132(c)(1)(A)
penalty."  Starr v. Metro Systems, Inc., — F.3d —, 2006 WL 2434477, *2 (8th Cir.
Aug. 24, 2006) (citing Chesnut v. Montgomery, 307 F.3d 698, 704 (8th Cir.2002).
See also Brown v. Aventis Pharmaceuticals, Inc., 341 F.3d 822, 825 (8th Cir. 2003)
(§ 1132(c)(1)(B) penalty).

---

[20] The "plan administrator" is the "plan sponsor" unless otherwise specified in
the plan.  See 29 U.S.C. § 1002(16)(A)(ii). Where an employee benefit plan is
maintained by a single employer, the "plan sponsor" is deemed to be the employer.
See 29 U.S.C. § 1002(16)(B)(i).

Hartland also argues in its reply brief that Davis received notice, and, in support of this argument, has produced a copy of a document which it claims Davis signed on February 1, 2005, electing not to continue her group health coverage under COBRA. Our local rules permit the filing of reply briefs and additional evidence as a matter of course, but the purpose of a reply brief is only to "address factual or legal issues raised in the opposing brief." NECivR 7.1(c). Because the newly filed evidence pertains only to an issue that was not raised in Hartland's original brief or discussed in Davis's opposition brief, I will not consider it.[21]

### III. CONCLUSION

Summary judgment will be denied except insofar as Davis seeks to recover punitive damages on her Title VII claims.

Accordingly,

IT IS ORDERED that Defendant's motion for summary judgment (filing 24) is granted in part and denied in part, as follows:

1.  The motion is granted with respect to Plaintiff's claim for punitive damages associated with Defendant's alleged violations of Title VII.

2.  In all other respects, the motion is denied.

September 28, 2006.                    BY THE COURT:

                                       s/ *Richard G. Kopf*
                                       United States District Judge

---

[21] Hartland states that the document was "recently discovered" (filing 31 at 3), but it has not made any showing that it was prevented from producing the document when its original brief was filed. In any event, the document has not been properly authenticated.

34